Filed 8/28/20  Marriage of Chyczewski CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re Marriage of LINGYUN JIA and JACEK G. CHYCZEWSKI. | |
| LINGYUN JIA CHYCZEWSKI, Respondent, v. JACEK G. CHYCZEWSKI, Appellant. | G057124 (Super. Ct. No. 11D003110) O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, James L. Waltz, Judge.  Affirmed.

Law Offices of Marjorie G. Fuller and Marjorie G. Fuller; Snell & Wilmer, Todd E. Lundell and Jing Hua for Appellant.

Kaufman Steinberg LLP and Stephen J. Kaufman; Law Offices of Gregory R. Ellis; Gregory R. Ellis and Peter H. Gold for Respondent.

## INTRODUCTION

This is a high-asset divorce case with a corresponding level of vitriol. The underlying facts establish that Jacek (Jack) and Lingyun Chyczewski operated a flooring business both before and during their marriage. By the time the case came to trial in 2017, they had been separated for six years. During the marriage, Jack and Lingyun worked extremely hard to build up the business and to make it the premier flooring company on the "Tile Mile" in Anaheim. Nevertheless, when it came time to divide the marital estate, Jack maintained it was all his.

Unquestionably, Jack owned the flooring business before marriage. The court's task was to determine whether and by how much the value of the business increased during the marriage owing to community efforts. Likewise, the court had to decide whether several pieces of real estate purchased during the marriage were community property or Jack's separate property.

The family court concluded that the increased value of the business during the marriage was primarily due to community efforts and set an amount for this value, with the remainder as Jack's separate property. It also determined that the funds used to purchase the real estate were commingled funds and thus the real estate was community property. Finally, the court made a long-deferred determination that Lingyun was entitled to retroactive spousal support. In addition, the court charged the community $280,000 as its portion of the expenses incurred to clear one of the real properties of inventory and debris after Jack sold it. Jack disputes all these decisions.

We affirm the judgment. The family court is entrusted with wide discretion in a divorce case when choosing a method for valuing property. The court's decisions relating to the nature and value of the property seem to us to be supported by substantial evidence, and we cannot find any abuse of discretion. Jack asks us, in effect, to retry the

2

case, substituting our judgment for the trial court's, which we could not do even if that judgment differed from the trial court's.[1]

## FACTS

Jack and Lingyun's marriage lasted a little over nine years. There were no children.

It was undisputed that Jack owned a flooring business, Jolanta Tile, before marriage.[2] He imported materials used in the business – slate, ceramic tile, etc. – from China. The parties agreed that the increase in business value would be calculated between December 31, 2001, and December 31, 2010, dates closely approximating their marriage and separation. The court valued the business at $814,000 as of the date of the marriage, relying on evidence from Lingyun's accounting expert. The value as of the date of separation was $6,047,000, a number also supplied by Lingyun's expert.

A central issue at trial was the extent to which Jolanta Tile had prospered from the efforts of the community as opposed to outside factors such as a robust economy. Lingyun contended community efforts were largely responsible for the increase in value. Jack maintained the community efforts were minimal – and adequately compensated; outside factors cause the increase in value. Jolanta Tile's increased value and the earnings, profits, and distributions made during the marriage from the business were therefore his separate property.

Another issue was the disposition of six pieces of real estate or their proceeds. During the marriage, Jack formed three limited liability companies, and each company purchased a piece of property to be used in the business. In addition, Jack purchased a residence in Yorba Linda in 2002, at which the couple lived during the

---

[1] Jack's appeal purportedly does not challenge the evidence or the trial court's exercise of discretion, but rather the court's "legal conclusions and application of the law, and its refusal to follow the public policy of California[.]"

[2] Jack also owned some Chinese subsidiary companies that were involved in the flooring business. For convenience, we will refer to all the premarriage companies as "Jolanta Tile."

3

marriage. The residence was destroyed by fire in 2008. Jack also bought his mother a condominium in Canada, which he sold when his mother died. Finally, before they were married, Jack and Lingyun bought adjoining condos in Beijing. The source of the funds to purchase all the properties was disputed.

After a 19-day trial, the court decided substantial community efforts accounted for Jolanta Tile's increased value. The court pointed to the punishing hours both Jack and Lingyun devoted to the business. It also credited Lingyun, who is Chinese, with playing a substantial part in its success, which depended in part upon transactions in China. A trial exhibit showed the difference between the number of containers shipped before and after Lingyun joined the business. She spoke Chinese; Jack did not. She was familiar with Chinese customs and business methods, having worked in the industry for years before marrying Jack. Perhaps most importantly, she was able to clean up after Jack, whose business plan frequently involved delaying payments to Chinese suppliers or "stiffing" them altogether. Lingyun was instrumental in placating the suppliers or finding new ones upon which Jack could practice.

In keeping with his philosophy that everything was his, Jack had commingled separate and community property funds in such a way that his separate property was not traceable. The court found the community was inadequately compensated for its efforts on behalf of Jolanta Tile during the marriage.

As to the real estate, the court determined that Jack had bought the marital residence in Yorba Linda in 2002 using funds from the business. He took title to the property as an unmarried man, even though he and Lingyun were married at the time. The Canadian condo was also purchased with cash proceeds from the business. The three properties owned by Jack's limited liability companies had been purchased with commingled funds and bank loans.

The Beijing condos had been purchased before the marriage. The court awarded one each to Jack and to Lingyun. The court reasoned that Jack had bought his

4

with his separate funds and Lingyun had bought hers with the salary Jack owed her (but had not paid), which were her separate funds.

A site owned by one of Jack's limited liability companies was used to store Jolanta Tile inventory. The court charged the community with $280,000 of the expense required for moving the inventory to another site after the property was sold. Jack contends this amount was too low.

Finally, at the end of trial, the court awarded Lingyun $8,000 per month in retroactive temporary spousal support between May 15, 2011, and March 14, 2016.[3] Jack disputes this award.

## DISCUSSION

Jack has identified four main issues on appeal. He asserts that Jolanta Tile's increase in value was improperly calculated, and that the business and residential properties purchased with the proceeds of the business are his separate property. He disputes the amount the court allocated to the community for moving expenses. Finally, he asserts that the court should not have awarded retroactive temporary spousal support to Lingyun.

"The trial court's findings on the characterization and valuation of assets in a dissolution proceeding are factual determinations which are reviewed for substantial evidence. [Citation.]" (*In re Marriage of Campi* (2013) 212 Cal.App.4th 1565, 1572.) "'In this regard, the court has broad discretion to determine the manner in which community property is divided and the responsibility to fix the value of assets and liabilities in order to accomplish an equal division. [Citations.] The trial court's determination of the value of a particular asset is a factual one and as long as that determination is within the range of the evidence presented, we will uphold it on appeal.' [Citation.]" (*Ibid.*).

---

[3] Lingyun waived spousal support going forward.

5

A perusal of the court's statement of decision reveals that the court based its findings on the evidence presented at trial and specifically on the competing analyses of the parties' forensic accountants. It is replete with references to which party's evidence was more persuasive or whose testimony the court believed.

Because Jack bore the burden of proof on several issues, our substantial evidence review of these issues differs from the standard we would use for an appealing defendant, that is, someone who contended that the party with the burden of proof had *not* borne it, after the trier of fact concluded it had. In this case, the party with the burden of proof, Jack, contends that he *did* bear it, after the trier of fact concluded he did not. "On appeal from a determination of failure of proof at trial, the question for the reviewing court is "'whether the evidence compels a finding in favor of the appellant as a matter of law.'" [Citation.] Specifically, we must determine "'whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.'"" [Citation.] We are also guided by the principle that the trial court's judgment is presumed to be correct on appeal, and we indulge all intendments and presumptions in favor of its correctness." (*Almanor Lakeside Villas Owners Assn. v. Carson* (2016) 246 Cal.App.4th 761, 769 (*Almanor*).) That is a tougher row for an appellant to hoe.

Another overarching issue, in addition to the standard of review, is credibility. While the trial court was unlikely to propose either Lingyun or Jack for the Washington Cherry Tree Award for honesty, Jack's truly remarkable lies eventually convinced the court it would be hard pressed to take his uncorroborated word for anything.[4]

Jack lied on his income tax returns, claiming to be single. While married, he took title to the marital residence in 2002 in his own name as an unmarried man. He

---

[4] In his opening brief, Jack allows as how his "credibility was somewhat lacking during the trial." This is a considerable understatement.

defrauded his suppliers. But the lie that topped them all – from the court's point of view – was the fraudulent insurance claim.

The Yorba Linda residence burned down in 2008, and Jack collected $1.8 million from the insurance company. Part of the money was intended to compensate for the loss of some expensive silk embroideries Jack claimed had been destroyed in the fire. He told the same story at trial, under oath. It turned out that the embroideries were not destroyed; in fact, they were hanging on the wall in Jack's residence.[5] This is a fairly spectacular trial development. The trial court allocated the embroideries to the insurance company, as it had paid for them.

The combination of findings arrived at by the court after considering conflicting evidence and determining credibility – calls we are bound to accept – makes appellant's burden Brobdingnagian whether we apply the substantial evidence or abuse of discretion standard of review.

## I.          Increase in Business Value

The court found that the value of Jolanta Tile increased from $814,000 at the date of marriage to $6,047,000 at the date of separation.[6] It found that Lingyun's accounting expert was more reliable than Jack's, and it did not find Jack's attributions of the increase to outside factors "persuasive." The court also based its figures on its own analysis of the data. Using the *Pereira* method, the court confirmed $4,720,180 to the community as its interest in the business value and $1,326,620 to Jack's separate property. Jack's side of the ledger therefore gets half of the community's $4.7 million plus his separate $1.3 million.

Jack makes two arguments regarding the valuation of the business. First, he argues the increased value calculation was erroneous because Lingyun's expert did not

_____

[5]      The appellant's appendix includes 95 trial exhibits. It does not, however, include any of the exhibits cited by the court as showing "instances of [Jack's] perjury."

[6]      The court noted that one year after separation, Jack applied for a loan and told the bank his business was worth $6,105,634.

7

base his analysis on Jolanta Tile's fair market value.[7] He committed a further error in valuing Jolanta Tile's main asset – its inventory – at booked value, rather than fair market value.

Jack contends the court *must* use fair market value – the price a willing buyer would pay to a willing seller – to determine the value of the business. He also contends that using booked value for the inventory was error and that the court should have used the *Van Camp* method rather than the *Pereira* method for valuing the increase during the marriage because the inventory was Jolanta Tile's main asset.

A.　　　　Measure of Value

"Under [Family Code] section 2550, the court must divide the community estate of the parties equally. In this regard, the court has broad discretion to determine the manner in which community property is divided and the responsibility to fix the value of assets and liabilities in order to accomplish an equal division. [Citations.] The trial court's determination of the value of a particular asset is a factual one and as long as that determination is within the range of the evidence presented, we will uphold it on appeal. [Citations.]" (*In re Marriage of Duncan* (2001) 90 Cal.App.4th 617, 631-632 (*Duncan*).)

Jack and Lingyun both had accounting experts who testified about the value of Jolanta Tile as of the two dates upon which the parties agreed. The trial court found Lingyun's expert more reliable and considered Jack's expert's opinions the product of "'fuzzy assumptions'" and a desire to bolster Jack's position. "In the exercise of its broad discretion, the trial court 'makes an independent determination of value based upon the evidence presented on the factors to be considered and the weight given to each. The trial court is not required to accept the opinion of any expert as to the value of an asset.'

_____

[7] Jack also contends that the starting figure, $814,000, is erroneous because if failed to take into account the value of two of his Chinese subsidiaries, which were capitalized with $150,000 each before marriage. The subsidiaries were capitalized in 1997 and 1999. There was no evidence of their value in 2001. Jack's expert valued them as of their date of incorporation, based on Jack's word, but had no evidence of their value as of 2001. The two subsidiaries were no longer operating as of December 2010. As noted above, the court did not regard Jack's word, standing alone, as reliable evidence.

[Citations.] Differences between the experts' opinions go to the weight of the evidence. [Citations.] Rather, the court must determine which of the recognized valuation approaches will most effectively achieve substantial justice between the parties." (*Duncan, supra,* 90 Cal.App.4th at p. 632.)

Lingyun's expert used a "going concern" value for the business because, as he stated, the business was not sold or for sale. "[T]he determination of the value of infrequently sold, unlisted, closely held stock is a difficult legal problem. Most of the cases illustrate there is no one applicable formula that may be properly applied to the myriad factual situations calling for a valuation of closely held stock. [Citation.] It is, therefore, incumbent upon a court faced with such a problem to review each factor that might have a bearing upon the worth of the corporation and hence upon the value of the shares." (*In re Marriage of Hewitson* (1983) 142 Cal.App.3d 874, 888.)

Jack's reliance on *In re Marriage of Cream* (1993) 13 Cal.App.4th 81 to support his position that the *only* permissible method for valuing Jolanta Tile was fair market value ignores case law and misapprehends *Cream.* The court in that case did not hold that fair market value was the only way to value a business. It held that the trial court could not delegate its responsibility to determine fair market value. (*Id.* at p. 88.) As to the choice of valuation methods, the court had this to say: "In our view, the fair market value of a *marketable asset* in marital dissolution cases is the highest price on the date of valuation that would be agreed to by a seller, being willing to sell but under no obligation or urgent necessity to do so, and a buyer, being ready, willing and able to buy but under no particular necessity for so doing. *We restrict the use of this definition to marketable assets because some marital assets are not marketable, but nonetheless may have to be valued.*" (*Id.* at p. 89, italics added.) That last is our case.

As numerous cases have held, the court has a broad duty to divide the marital estate in the most equitable way possible. The court is permitted a wide latitude in the methods it uses to do so. Using the going-concern value for a business that was in

9

fact a going concern – operated solely by Jack since separation and Lingyun's consequent expulsion – does not appear to us to abuse the court's discretion in the selection of valuation methods.

### B.  Value of Inventory

Both accounting experts agreed that Jolanta Tile's inventory – which Jack had built up over the years as part of his business plan – was the company's main asset. They differed in how to value it.

Jack's expert steeply discounted the inventory because, Jack claimed, it was "very old, decayed, and not saleable."  Lingyun's expert valued the inventory at booked value, that is, the value Jack ascribed to it on financial statements, federal tax returns, and loan applications.  The court refused to allow the discount and relied on booked value. Jack argues that this was error.

The court explained its reasons for doing so at some length.  The main reason was that Jack had used booked value for the inventory when it suited his purposes – getting loans, paying lower taxes – so it did not seem equitable to allow him to substantially discount its value when his prior position worked against him.  The court pointed to multiple loan applications and tax returns since separation in which Jack valued the inventory at booked value.  Moreover, if it was true that the inventory had been allowed to deteriorate in the years since separation (and the court was dubious, given Jack's poor credibility track record), that was Jack's responsibility, since he had exclusive control over the inventory.

Once again, Jack argues that fair market value is the only permissible way to value the inventory and disputes the court's choice of valuation.  Jack's method is clearly not the only one.  He used booked value when he was trying to borrow money, and he told the government, under penalty of perjury, that the inventory was worth its booked value when he filed Jolanta Tile's tax returns.  It was not an abuse of the court's discretion to hold him to these prior characterizations when it came to his divorce.

10

### C.      *Pereira* or *Van Camp*

Jack disputes the trial court's choice of the *Pereira* method of determining Jolanta Tile's increase in value during the marriage. Jack claims the court should have used the *Van Camp* method, or at the very least, a hybrid of the two.[8] We review the trial court's choice of apportionment method for abuse of discretion. (*In re Marriage of Dekker* (1993) 17 Cal.App.4th 842, 852-853 (*Dekker*).) The trial court has broad discretion to choose the formula that will best achieve substantial justice. (*In re Marriage of Brooks* (2019) 33 Cal.App.5th 576, 590.)

"*Pereira* is typically applied where business profits are principally attributed to efforts of the community. [Citations.] Conversely, *Van Camp* is applied where community effort is more than minimally involved in a separate business, yet the business profits accrued are attributed to the character of the separate asset. [Citation.]" (*Dekker, supra,* 17 Cal.App.4th at p. 853.)

We do not see an abuse of discretion in choosing the *Pereira* method. The court recounted the various community components that went into making Jolanta Tile a success, while finding Jack's proffered explanations of "external factors" "not persuasive."

On appeal, Jack says that the court erred in attributing the increase in value to community efforts when the real reason for Jolanta Tile's increase in value was the increase in inventory. Jack maintains that during the marriage, the inventory grew but sales did not.

The court found that "Jack dominated and controlled all financial decision making and he squeezed from the businesses its business earnings, profits and

---

[8]      The *Pereira* method is derived from *Pereira v. Pereira* (1909) 156 Cal. 1. It is typically applied when the increase in business value is primarily attributable to community efforts. The court must allow a "reasonable gain to the separate estate from the earnings properly allowable on account of the capital invested" (*id.* at p. 7) to the separate property business. The rest is community property. The *Van Camp* method, so called from *Van Camp v. Van Camp* (1921) 53 Cal.App. 17, applies when the profits during the marriage are attributed to external factors, such as a return on investment, rather than to the community. (*Id.* at p. 29.)

11

distributions to buy more and more inventory, expand his business footprint and operations in California and in China . . . ." The court also found that "[I]t was Jack's strategic plan and goal to ramp up (expand and grow) inventory. . . . During the robust economy between 2000 and 2006, Jack and Lingyun sold a lot, and they reaped a lot of profit, making possible the purchase of five properties. [¶] 1. Jack believed that if the businesses had ample stock on hand, in the long run he would gain an industry advantage over other sellers. Jack viewed his stock pile of inventory like stored cash, the inventory adding to his prominence within the industry."

Jack's argument here assumes the inventory appeared like the gentle rain from heaven that drops upon the place beneath. The court's conclusion – the inventory was paid for out of money obtained by Jolanta Tile from "a lot" of sales – makes far more economic sense. And in turn, the court found that the sales volume during the marriage was attributable mainly to community efforts. The court's choice of the *Pereira* method to calculate Jolanta Tile's increased value did not abuse its discretion.

## II.        Character of Real Estate Acquired during Marriage

Jack disputes the characterization of five pieces of real estate, all acquired during the marriage, as community property. Three of the properties were purchased for business uses through three limited liability companies owned by Jack. The other two properties were residential. Jack claims they are all his separate property because they were purchased with a combination of separate property cash from Jolanta Tile (for down payments) and separate property loans.

We start with some presumptions and principles. Property acquired during marriage is presumed to be community property (Fam. Code, § 760), and the spouse who wants it declared separate property bears the burden of overcoming the presumption. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 610-611.) Likewise, commingled separate and community property funds are presumed to be community funds, and it is the burden of the spouse claiming separate property to trace the separate funds. "'Where funds are paid

12

from a commingled account, the presumption is that the funds are community funds. [Citations.] In order to overcome this presumption, a party must trace the funds expended to a separate property source. [Citation.] This issue presents a question of fact for the trial court and its finding will be upheld if supported by substantial evidence.' [Citation.] When the trial court has found the funds to be community, the question on appeal is whether substantial evidence supports that finding." (*In re Marriage of Higinbotham* (1988) 203 Cal.App.3d 322, 328.)

To prevail on this issue, Jack had to make two showings. First, he had to show that the cash used for down payments or purchases was separate property cash. Second, where applicable, he had to show that the lenders relied primarily on his separate property when they made the loans.

### A.       Cash

It was undisputed that Jack owned Jolanta Tile before marriage to Lingyun. The court, however, found that the community had not been adequately compensated during the marriage for its efforts in making Jolanta Tile a success.[9] "[S]ince income arising from the [spouse's] skill, efforts and industry is community property, the community should receive a fair share of the profits which derive from the [spouse's] devotion of more than minimal time and effort to the handling of his separate property." (*Beam v. Bank of America* (1971) 6 Cal.3d 12, 17; see also *Romanchek v. Romanchek* (1967) 248 Cal.App.2d 337, 342.)

The trial court also found that during the marriage Jack put everything in one pot and made no effort to distinguish between community funds and separate funds. In Jack's mind, everything was his. Only during the divorce proceedings did Jack

---

[9] On appeal, Jack argues that the parties *stipulated* that the funds used to buy the properties were his separate property. The actual stipulation was that Jack's accountant had traced the money to Jolanta Tile. That's an important difference. Lingyun did *not* stipulate that Jolanta Tile money was all Jack's separate property, a decision the trial court had to make.

"retroactive[ly]" try to disentangle what belonged to the community from his separate property.

At the very least, the finding that the community was inadequately compensated means that the unpaid portion of its compensation went into the pot, along with whatever separate property profits and distributions were also in it. When Jack used Jolanta Tile funds to buy real estate, he was using both separate and community funds, i.e., commingled funds, to make the purchase.

It was up to Jack to show that the cash he used to buy the real estate was separate property funds, not commingled funds, and the court ruled that he had not carried this burden. As stated above, if the court determines that a party with the burden of proof has not carried it, we ask on review "'""whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.'""" (*Almanor, supra,* 246 Cal.App.4th at p. 769.) Jack's evidence does not meet these requirements.

One of the business properties, discussed in more detail below, was purchased in 2002. Jack argues that he bought this property so soon after he and Lingyun were married that there was not enough time for the community portion of the earnings and profits to reach a level to cover the cash down payment. His syllogism concludes the cash must therefore have been separate property cash.

But the argument misses the point. It was not necessary for *all* of the down payment to come from community funds. There was enough time for *some* of the cash to be community earnings. It was therefore Jack's job to distinguish the separate property funds (from before the marriage) in the bank account from the community earnings from the months following the marriage in the same bank account. If he could not do this, then it was presumed that they were all community funds. The trial court held he had not done

14

this. Logic is admirable, but adequate tracing would have given him a better chance at success.

One other real estate purchase for cash must be mentioned here. In 2004, Jack bought a Canadian condominium for his mother during the marriage for cash from Jolanta Tile. After his mother died, Jack sold the condo. The court held that the proceeds of this sale were community funds, again because of commingling. This seems unimpeachable.

## B. Lender Intent

The other component of Jack's burden for four of the properties is lender intent. The three commercial properties and the marital residence were partly financed through loans. Loans made during marriage are presumptively community funds. (*In re Marriage of Stoner* (1983) 147 Cal.App.3d 858, 864.) Property secured by a loan obtained during the marriage is ordinarily community property. (*Bank of California v. Connolly* (1973) 36 Cal.App.3d 350, 375-376.) Property financed during marriage through a spouse's general credit is community property. (*Id.* at p. 375.) "In the absence of evidence tending to prove that the seller *primarily relied* upon the purchaser's separate property in extending credit, the trial court must find in accordance with the presumption." (*Gudelj v. Gudelj* (1953) 41 Cal.2d 202, 210 (*Gudelj)*, italics added).)[10] The spouse contending that the lender relied on separate property has the burden of proof. (Evid. Code, § 606.)

---

[10] The court stated several times that it used the "primarily relied" standard of *Gudelj*, rather than the "relied solely" standard of *In re Marriage of Grinius* (1985) 166 Cal.App.3d 1179, 1187 (*Grinius*). In discussing one of the properties, however, the court used the word "solely." We understand this to be a mistake and take the court at its word – it used "primarily relied" throughout.

According to the *Grinius* court, the "primarily relied" test of *Gudelj* represented a relaxation of the standard of prior Supreme Court opinions. *Grinius* was a return to the earlier standard of sole reliance. (*Grinius, supra,* 166 Cal.App.3d at p. 1187.)

15

### 1. 2300 E. Winston Road

One of Jack's limited liability companies bought this property in 2002. He paid the $1 million down payment with a combination of profits and cash distributions from the business and a loan from his ex-wife. He borrowed $3.7 million from a private investment group in July 2002. He refinanced the property in 2005.

The court found that Jack failed to prove lender reliance on his separate property for repayment in the initial purchase. Jack's ex-wife testified that she trusted Jack and "business was good." The witness for the investment group testified they relied primarily on the desirable location of the property – it "was a property that we would have liked to have owned" – along with "credit, income, location, . . . and . . . my feel for Jack as an individual[.]"[11] The size of the down payment was also a significant factor. The trial court found that neither lender relied *primarily* on Jack's separate property in making the loans.

The court also found that the refinancing bank relied on Jack's loan application, in which he falsely claimed to be unmarried, and on his personal tax returns, in which he also claimed to be single. The loan was secured by the property. The bank was satisfied that cash flow from the business would be adequate to service the debt. The bank made the loan commitment in June 2005, at which point Jack and Lingyun had been married for more than two years.

In short, the trial court found that the lenders relied on a "combination of factors, not one primary factor, those factors including profits and cash distributions, the product of community efforts . . . Jack's general creditworthiness, and the lender having adequate recourse in the event of a default." As Jack had the burden of proof, he must

---

[11] The court found this witness, Robert Socci, not credible when he testified he did not know whether Jack was married. On appeal, Jack argues the trial court tarred Socci with Jack's lack of credibility brush. We don't see this. It seems to us the trial court assessed Socci's credibility independently and decided his financial interests were too closely aligned with Jack's to make him an unbiased witness.

16

show that the evidence compelled a finding in his favor as a matter of law. (See *Almanor, supra,* 246 Cal.App.4th at p. 769.) It did not.

### 2. 2250 E. Winston Road and 2260 E. Winston Road

These parcels were purchased by two of Jack's limited liability companies in 2004 with a combined loan application. Jack used a combination of profits and cash from the business and a loan from Bank of America to purchase the properties. The deed of trust for 2250 E. Winston was signed on December 28, 2004, a little over three years after the marriage. The deed of trust for 2260 E. Winston appears to have been signed about the same time.[12]

After hearing testimony from the Bank of America representative who handled the loan, the court concluded the lender relied on "a combination of factors . . ., including Jack's labor, skill, talent, a history of stable profits, and Jack's personal guarantee." Jack was recognized as "the business owner . . . the financial guy . . . he runs the show, and he gives the orders[.]" He was the company's "driving force," "making Jolanta Tile successful." The bank also looked favorably on the large down payment and the below-market loan-to-value ratio of the two properties. Once again, the court found Jack failed to carry his burden to show primary reliance on separate property, and we see no basis for quarreling with that conclusion.

### 3. Yorba Linda residence

The Yorba Linda residence was acquired during the marriage, notwithstanding the fact Jack again took title as an unmarried man. Jack claimed he used his separate property funds, from his separate property business, as well as a bank loan, to buy the house. The house burned down in 2008. The insurance company paid Jack $1.8 million to cover the loss. The court ordered the property sold in 2016; the sale netted $314,930.

---

[12] The signature page is missing from the record.

17

The court found that the funds used to purchase the house either came from earnings, profits, and distributions attributable to community efforts or were commingled funds, the separate character of which was lost. The court also held that Jack failed to prove lender intent because (1) he lied to the lender in stating he was unmarried and (2) he failed to prove the lender relied on his separate property when extending credit. Thus the bank loan was community property. Our analysis here is the same as it was for the Winston Road property.

**III.      The Beijing Condominiums**

We deal with this issue separately because these properties were acquired before marriage. The presumptions and evidence thus differ from the presumptions and evidence relating to the community nature of the other properties.

Before their marriage, Jack and Lingyun each executed a contract to buy a condo in Beijing in their respective names. They used one for an office and the other for a residence while they did business in China. Lingyun testified the down payment to purchase her condo came from unpaid salary owed to her by Jack. Jack said he did not know that one unit was in Lingyun's name and that both units were his separate property. The court did not believe Jack.

Payments on the condos were made between 2000 and 2010, when the balance was paid in full. As with the other real estate purchases, the court found Jack had failed to provide adequate tracing to establish that his separate property made these payments.

The court decided that when title vested in 2010 – after the balance of the purchase price was paid off – it related back to the original signing of the contract in 2000. Relying on the presumption of title of Evidence Code section 662, the court

18

awarded the condo in Jack's name to him as his separate property and the condo in Lingyun's name to her as her separate property.[13]

On appeal Jack does not distinguish between the funds used for the down payment and any payments before December 2001 (pre-marriage) and the funds used to pay off the balance after December 17, 2001. But the funds used to make the down payment could not have been community funds because Jack and Lingyun were not yet married. And the payments made during the marriage, the court held, were not adequately traced to Jack's separate property. We have already dealt with the deficiency of Jack's tracing.

Ultimately the court relied on the presumption of Evidence Code section 662 to find that Lingyun held title to her condo. Jack has not explained how he has overcome the presumption.

IV.        **Moving Expenses[14]**

A property owned by one of Jack's limited liability companies had been used to store Jolanta Tile inventory as well as what the court variously described as "'stuff' and 'debris' probably having zero to de minimis value," "'other stuff,'" and "junk." The parcel was sold, and the inventory and the "other stuff" had to be moved off of the 10-acre site.[15] Part of the material was going to be stored in a warehouse next door (on property owned by another of Jack's limited liability companies), and part of the material was going to the Jolanta Tile showroom a mile away. The parties agreed Jack

_____

[13]        Evidence Code section 662 provides, "The owner of the legal title to property is presumed to be the owner of the full beneficial title. This presumption may be rebutted only by clear and convincing proof."

[14]        The court ruled on this issue on June 13, 2018, in a ruling separate from the issues dealt with in the statement of decision.

[15]        Jack sold the real estate sometime in 2017, without notifying Lingyun or the court, and entered into a one-year lease with the buyer. Escrow closed on July 27, 2017, and Jack continued to use the parcel for his separate property business. The court ruled on June 21, 2017, that the parcel was community property and ordered it sold, only to learn it was, in effect, already sold. At that point, the best the court could do was to secure the proceeds of the sale in an attorney trust account, as the court had "zero confidence that Jack will cooperate and pay to Lingyun the equalization due under this comprehensive ruling[.]"

19

would be in charge of clearing the site, and the community would be charged with a portion of the costs involved.[16]

The court faced a difficult task in calculating the community portion of the moving costs. Jolanta Tile's inventory was "a substantial factor in calculating the increased value of Jack's separate property business during the marriage," that is, between the end of 2001 and the beginning of 2011. From the date of separation to the resolution of the divorce (between 2011 and 2018), Jack had been operating the business as his separate property and presumably buying inventory with Jolanta Tile money. In essence, the court had to figure out how much it would cost to move the community inventory (accumulated between 2002 and 2010) and how much it would cost to move Jack's separate property inventory (accumulated between 2011 and 2018). Or, to put it another way, how much of the total cost to move all the inventory should the community pay for?[17] As the court explained, this was not an issue that usually came up in family law cases, and it was operating without a "playbook" or a "road map."

The court heard various estimates of the cost to clear the site. Lingyun suggested various amounts for total removal of the inventory, at one point estimating the community charge as $214,006. She also declared, based on past experience, that she thought the inventory could be moved for less than $200,000. Jack wanted $717,692 for the job, exclusive of an amount that he believed he should be compensated for overseeing it. An outside contractor wanted $1.2 million. So far as we can tell from the record, these latter two estimates were for the total amount. As stated above, the court had to

---

[16] The court had initially thought about hiring an outside company to clear the site, but decided, on reflection, it would be better for Jack to handle it, as the inventory was, at this point, his property. Also Jack would be cheaper because the outside company would have to make a profit.

[17] The court determined that Jack should pay for moving the "other stuff," i.e., non-inventory, since it was solely his decision to store it on the site.

The court also had to estimate the cost of "sift[ing] and sort[ing] inventory, separating the good and saleable inventory from decayed inventory, and re-stacking and bundling the 'good' inventory within new pallets . . . and then re-organizing the saleable inventory within the warehouses on the other side of the chain link fence." These activities benefited only Jack's separate property business, and their costs could not be charged to the community.

20

determine how much of the total should be charged to the community, based on how much community inventory was still on the site after six years.

The court charged the community $280,000 as its portion of the expenses to move the inventory. Jack now argues that the court improperly based its amount on its own experience, rather than on the evidence, and the final number was arbitrary, with no evidentiary support.

The court had ample evidence upon which to base its estimate of the community's responsibility for moving the inventory. Lingyun estimated that job could be done for somewhere between under $200,000 and $319,000. She also pointed out components of Jack's estimate that were either due to his mismanagement or improperly charged to the community. She estimated that between zero and 40 percent of the inventory on the site in 2018 was community inventory.

Jack's estimate was clearly inflated, as much of it paralleled the estimate of the independent contractor, who had to build a profit and some cushion into his final figure. The court was also wary of Jack's figures, in light of its assessment of his credibility.

In short, contrary to Jack's contention, the court based its final figure on all the evidence before it. It was essentially being asked to estimate the cost of erecting a yurt on Mars with three fairly unreliable bids. The number it arrived at was not pulled out of the air but took into account the many aspects of the project as well as the several estimates presented to it. Although it was on the low end of the estimates, it was not as low as some of the numbers Lingyun put before the court. We see no basis for second-guessing it.

Jack also argues the judge improperly based his decision solely on his own experience rather than on the evidence. The record does not support this argument. The judge explained that he had worked at a lumber yard during college. Because of this work experience, he had a greater insight into the details of moving products than would

21

someone without this experience.  It enabled him to knowledgeably discuss such topics as shrink-wrapping and pallets with the contractor who had given the $1.2 million estimate for the job.  It also made the judge sensitive to the likelihood Jack would use the move as an opportunity to "improve" his separate-property inventory at the community's expense and alert to forestall any such attempt.  And it helped him evaluate whether costs were being inflated.

But the judge's college experience could not have helped him to decide how much to charge the community.  This decision involved, first, determining a reasonable cost for the entire job and then, second, estimating the percentage of that cost that could be attributed to moving community-property inventory, as distinct from separate-property inventory and "other stuff," and as distinct from "improving" the separate-property inventory by getting rid of the unsalable portion and repackaging and reorganizing the saleable portion.  Driving a forklift in a lumber yard in college could not have helped with this decision and we find nothing in the record to indicate the judge improperly applied it.

Moreover, Jack is estopped from objecting on appeal to the judge's bringing his life experience to bear on the moving expenses issue.  After explaining his college job in the lumber yard, the judge stated, "I thought it was necessary to tell you what is my life's experience so that you can ask questions to challenge me and push me back that those life's experiences are or are not applicable here."  Rather than object, Jack's counsel stated, "I actually think your life experiences will actually shorten the testimony because I won't have to go into such areas in depth,  . . ."  In short, Jack was all for using life experience until the experience did not go his way.  (See *In re Marriage of Ilas* (1993) 12 Cal.App.4th 1630, 1639-1640 [invited error].)

By setting the community charge for moving expenses at $280,000, the court implicitly decided that a significant amount of inventory accumulated between 2002 and 2010 (i.e., community property inventory) was not still present on the site.  The

22

appellant must show error (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 822), and Jack has not shown that this assessment was out of the range of reasonableness, given the various estimates and explanations the parties provided to the court.

Finally, Jack objects to having the expense of cleaning up the "other stuff" charged to him alone. He argues the court decided the parcel was community property, so the community should have to pay for cleaning up the non-inventory "junk" as well as for moving the inventory.

The reason the court found the parcel was community property is that it had been acquired during the marriage with presumptively community property funds. The reason the community was charged with part of the cost of clearing the parcel is that some of the inventory stored there was, presumably, community-property inventory, that is, inventory bought during the marriage.

But there was no evidence as to where the "other stuff," aka "junk," came from, or when it arrived, or who, if anyone, paid for it. It played no part in the valuation of the business. And it was Jack's decision, as part of his singlehanded management of the business, to store the "junk" on the property.[18] The court did not abuse its discretion in placing the cost for removing it on Jack.

## V.          Retroactive Temporary Spousal Support

Jack argues the court lacked jurisdiction to award retroactive temporary spousal support because Lingyun allowed a motion for this support, made in May 2011, to go off calendar. If she wanted retroactive support, he says, she had to make a motion to restore the May 2011 motion to the calendar. Instead, she filed a new motion, on February 23, 2015. In effect, Jack contends that by filing a new motion instead of

---

[18]     Lingyun testified that during the marriage, when she worked at Jolanta Tile, debris was discarded frequently and not allowed to accumulate. This evidence supports the court's conclusion Jack was responsible for the presence of significant amounts of "other stuff" on the site.

23

moving to restore the former one, Lingyun waived or forfeited any right to retroactive support between May 2011, when Lingyun filed her first request for spousal support, and February 2015, when she filed the second request. Jack also disputes the monthly amount the court awarded, arguing the court did not make a finding in the statement of decision that he had the ability to pay.

The trial court dealt with the retroactivity issue in the course of ruling on a motion in limine. The court noted the history of Lingyun's requests for temporary spousal support. An order to show cause for temporary spousal support was issued on May 3, 2011, with a hearing date in June. The hearing on this order was continued multiple times, under the originally assigned judge, between 2011 and 2014.

In June 2014, the case was transferred to a new judge, who eventually tried the case. There was, by this time, a significant backlog of issues to be decided, including Lingyun's temporary spousal support. The court advanced these issues to "today" (June 13, 2014) and temporarily ordered them off calendar "subject to restoration at the T[rial] S[etting] C[onference]."

On February 23, 2015, Lingyun filed a request for order for spousal support with a hearing date in April. She stated in her declaration that Jack had been paying her $3,000 per month, per an agreement entered into in July 2011, but he had ceased these payments in December 2014. She added, "I have no other source of income. . . . Since our agreements were all oral with no supporting order I am now in a position where I am forced to file a Request for Order to obtain spousal support from [Jack]." The hearing was continued by stipulation to June, and Jack was ordered to pay Lingyun $3,000 in April and May. The hearing was continued again, by stipulation, to August, and Jack was ordered to continue paying $3,000 per month until further order of the court.

On July 31, 2015, an order to show cause for contempt was issued because, according to Lingyun, Jack had failed to make all but one of the support payments ordered in April 2015. The matter was set for hearing on October 2, 2015.

24

On March 14, 2016, the court held a hearing on several matters, mostly dealing with trial. The order stated, "The Court establishes *pendente lite* spousal support of $10,000 commencing 3/15/16 payable 1/2 on the 1st and 1/2 on the 15th of each month. This is a perspective [*sic*] order and the Court reserves on retroactivity." The record does not reflect any objection by Jack to this reservation.

Jack argues that once Lingyun's first request for support went off calendar, "[t]here was no longer a filing to which the date of retroactivity could apply, and no jurisdiction to award support until a new request was made." Jack supplies no authority for this argument. Case law is to the contrary.

In *In re Marriage of Dick* (1993) 15 Cal.App.4th 144, the court explained the difference between temporary and permanent spousal support, noting that while the Legislature placed a limit on how far back a retroactive order for permanent support could reach, it placed no such limit on retroactivity for temporary support. The court concluded a retroactive award could precede the date upon which a spouse actually filed an order to show cause for support. (*Id.* at pp. 165-166.) Therefore, even if Jack's argument about the effect of a motion's going off calendar is correct – and it is not – the court would still have authority to award temporary spousal support from a date preceding the filing of the request.

Jack also claims that Lingyun failed to follow proper procedure, thereby waiving a claim to retroactive spousal support. He relies on the Superior Court of Orange County Local Rules, rule 705(D), which requires a 90-day notice to restore an off-calendar motion to the court's calendar, notice Lingyun did not provide.

The rule in question states: "Continuance Policy [¶] The initial hearing date for a request for order hearing may be continued one time by telephonic notice to the clerk of the assigned department. Parties must be prepared to represent to the clerk that opposing parties have been contacted and consented to the continuance. Once a new hearing date is received, the party contacting the clerk must give written notice of the

25

new hearing date to the opposing party. [¶] A second or subsequent continuance of the hearing date will require the attendance of the parties and a showing of good cause. In the event that the second or subsequent continuance is denied, the request for order may go off calendar if the parties cannot proceed. A request for order which has been ordered off calendar may be restored to the court's calendar by written application and, if such application is made within ninety (90) days, the initial filing date will be deemed the filing date for purposes of determining the commencement of child and/or spousal support."

The local rule does not apply to this situation. It applies to continuances requested by parties and states what may happen if a second or subsequent request for continuance is denied. *If* a second or subsequent request is denied, and *if* the parties cannot proceed, the court *may* take the request for order off calendar. So far as the record before us indicates, however, the requests for continuances were never denied, so the rule was never activated. Moreover, the crucial continuance, the one that took place in June 2014, was ordered by the court. It was not requested by the parties.

The cases cited by Jack to support this argument – all of which deal with modifying support orders – have no application to this case. (See *In re Marriage of Williamson* (2014) 226 Cal.App.4th 1303; *In re Marriage of Freitas* (2012) 209 Cal.App.4th 1059; *In re Marriage of Gruen* (2011) 191 Cal.App.4th 627.) The Legislature has enacted statutes specifically dealing with modifications of support orders. (Fam. Code, §§ 3603, 3651.) These do not apply to support orders issued for the first time.

The real issue here is the trial court's ability to control its docket. (See *Walker v. Superior Court* (1991) 53 Cal.3d 257, 267; *Moyal v. Lanphear* (1989) 208 Cal.App.3d 491, 497.) Faced with multiple issues that had been hanging fire in some cases for years, the court set about handling the backlog as expeditiously as possible. It set dates for the most pressing matters and postponed the rest of them to the trial setting

26

conference.  It was the court, not Lingyun, that took the matters "off calendar" – that is, decided not to hear them on that day – while carefully maintaining them for decision at a future date.  Jack has no cognizable complaint about this.

**VI.**　　　　　**Statement of Decision**

Jack's argument regarding the deficiency of the statement of decision regarding his ability to pay is similarly lacking in merit.  He argues, not that he cannot pay, but that the statement of decision failed to give the evidentiary basis for the court's determination that he had the ability to pay.

Jack cites no authority for the idea that a statement of decision is prejudicially deficient because it does not include the evidentiary basis for a finding about his ability to pay.  A statement of decision does not deal with evidence, but rather with ultimate facts.  (See *In re Marriage of Burkle* (2006) 139 Cal.App.4th 712, 736, fn. 15; *In re Marriage of Garrity & Bishton* (1986) 181 Cal.App.3d 675, 686-687, superseded by statute on other grounds; *Estate of Hudspeth* (1964) 225 Cal.App.2d 759, 765; Code Civ. Proc., § 634.)  In light of the 19 days spent on a trial that was, by and large, concerned with nothing but money, we think the court had ample evidence of Jack's finances upon which to base a reasonable conclusion about his ability to pay.

## DISPOSITION

The judgment is affirmed.  Respondent is to recover her costs on appeal.


BEDSWORTH, J.

WE CONCUR:


O'LEARY, P. J.


MOORE, J.